**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| NANCY HIGHWOOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 2:06-CV-180 PS |
| | ) | |
| INDIANA STATE POLICE, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff, Nancy Highwood, was employed by the Indiana State Police ("ISP") as a motor

carrier inspector from September 1980 until her resignation in July 2005.  After resigning her

position, Highwood, who is Caucasian, filed suit claiming that she endured a racially hostile

work environment and that ISP discriminated against her based on her race (Count I).  She also

alleges that she was retaliated against for complaining about the racial harassment (Count II).

ISP has moved for summary judgment which, for the reasons set forth below, I grant as to Count

I but deny with respect to Count II.[1]

## FACTUAL BACKGROUND

In September 1980, Highwood began her employment with ISP as a motor carrier

inspector.  (Highwood Dep. at 8-9.)  Highwood was responsible for enforcing state and federal

laws relating to motor vehicles over 10,001 pounds or those carrying hazardous material signs.

(*Id.* at 9-10, 116.)  Highwood's specific duties included operating scales, conducting inspections,

and writing warnings and citations.  (*Id.*)  Motor carrier inspectors may be assigned to either a

---

[1]  Highwood also brought suit under 42 U.S.C. § 1983  (Count III).  Plaintiff has
conceded that summary judgment is appropriate on the § 1983 count.  Summary judgment is
therefore granted on Count III without further discussion.

stationary scale facility or roving inspections by way of a portable scale carried in a squad car. (*Id.* at 10-11; Barnett Dep. at 20.)  Throughout her employment with ISP, Highwood was assigned to either one of the two stationary scale facilities situated directly across from each other on Interstate 94, referred to by the parties as the "eastbound scales" and the "westbound scales."  (Highwood Dep. at 10, 33; Barnett Dep. at 20.)

In September 2003, Highwood was assigned to the eastbound scales, after having worked the westbound scales for several years.  (Highwood Dep. at 33.)  Highwood was on medical leave from July to November 2004, after which she returned to work at the eastbound scales. (*Id.* at 33-34.)  Highwood's supervisor at the eastbound scales was District Coordinator Cheryl Barnett.  (*Id.* at 11; Barnett Dep. at 5-6.)   Barnett is African-American.  (Highwood Dep. at 11-13.)  Barnett became the district coordinator for the eastbound scales in 1995.  (Barnett Dep. at 4.)

At different points between 1995 and 2005, Barnett supervised four African-American and eight Caucasian employees, including Highwood, at the eastbound scales.  (*Id.* at 16-18.) Prior to November 2004, all of the Caucasian employees other than Highwood had resigned, found new employment, or requested transfers to another location.  (*Id.* at 7-16.)  When Highwood returned to work in November 2004, the eastbound scales staff consisted of Barnett and three inspectors in addition to Highwood: Rachelle Adams, Willi Robinson, and Ja'Net Lucas.  (Highwood Dep. at 11.) Adams, Robinson, and Lucas are African-American.  (*Id.* at 11-13.)   Inspectors who liked to work together were typically paired as shift partners.  (*Id.* at 12; Barnett Dep. at 6-7.)  Robinson and Adams were shift partners, as were Highwood and Lucas. (Highwood Dep. at 12, 114.) Highwood and Lucas generally worked a different shift than

2

Adams and Robinson, though their working times could overlap due to overtime hours.  (*Id.* at 114-115.)

Highwood claims that the subject of race was frequently discussed at the eastbound scales, and that Adams in particular often engaged in angry conversations about race.  *Id.* at 59-60.  On one occasion, Adams told Highwood that "[Caucasians] were always favored, [Caucasians] were always given everything and [African-Americans] were never."  *Id.* at 60.  At another time, Highwood says Adams "screamed and yelled at me and told me that the reason things were the way they were in life was because of the way I was." *Id.* at 54.  On the morning of January 12, 2005, all four inspectors arrived for work at the eastbound scales, but the scales could not be opened due to fog.  (*Id.* at 49-50.)   An argument arose between Highwood and Adams about whether Robinson could leave work to visit a hospitalized family member without contacting Barnett, who was not scheduled to arrive at the eastbound scales until that afternoon. (*Id.* at 50-59.)  Highwood described the altercation as follows:

> [Adams was] [s]creaming at me that I was never to talk to her again. Started to advance to come towards me like she was going to hit me and . . . I said, "What are you going to do, hit me?"  And [Lucas] had gotten in front of her, and [Robinson], to stop her from coming towards me.  She told me that I was going to be taken out, that I would be taken down, and she would not get her hands dirty but I would be taken out; that there was a plan in effect to take me out already in the works.  And . . . she said "They're watching you."  And I said, "They're watching you too."  And she picked her skin up and said, "Who was black, guys?"

(Highwood Dep. at 52.)  Highwood estimated the screaming to have lasted between twenty and twenty-five minutes.  (*Id.*)

Following the altercation with Adams, Highwood contacted Barnett's immediate supervisor, Zone Coordinator Steve Baumgardt; Barnett had not yet arrived at the scales.  (*Id.* at 58.)  Highwood stated to Baumgardt that "you know there is a major black and white issue on

this side," to which Baumgardt responded, "I know there is." (*Id.*)  Highwood asked if she could

work at the westbound rather than the eastbound scales, to which Baumgardt responded, "as I

told everyone, there are two sides, you can work either side."  (*Id.*)  Barnett arrived at the

eastbound scales shortly after Highwood's conversation with Baumgardt and received accounts

of the altercation from Highwood, Adams, and Robinson.  (*Id.* 58-59.)  Barnett granted

Highwood a temporary transfer to the westbound scales as a "cooling-off" period, which began

the following day.  (*Id.* 58-59; Barnett Dep. at 23.)

Barnett held a staff meeting with all eastbound scales employees on January 14, 2005 to

discuss the incident of January 12.  (Barnett Dep. at 27.)   Highwood testified that during the

meeting, Adams stood up and "just started screaming . . . at me, called me Satan, told me that I

was Satan and that I would get mine."  (Highwood Dep. at 64.)  Highwood testified that at the

meeting "[Barnett said] 'What goes on here stays here.  You do not take this down to

Indianapolis.  You do not take it anywhere.'  She informed me that if I were to go forward with

it, I would be fired and [Adams] would be fired."  ( Highwood Dep. 63-64.)  Barnett also told

Highwood during the meeting that she wanted her to return to work at the eastbound scales.  (*Id.*

at 67.)

 Following the meeting Barnett telephoned Baumgardt and confirmed that he had

approved Highwood's temporary transfer to the westbound scales.  (*Id.* at 64.)  Barnett then told

Highwood that she could continue working at the westbound scales.  (*Id.* at 17, 64-65.)  Later, on

January 14, Barnett wrote a memorandum documenting the discussions she had with her staff

regarding the January 12 incident and January 14 meeting, and emailed it to Baumgardt.

(Barnett Dep. at 37, Ex. 1.)  Barnett indicated in the memorandum that Highwood had reported

being threatened three times by Adams, and that Highwood feared for her safety as a result of

Adams' conduct. (*Id.*) Barnett also described Highwood's understanding that Adams, in pinching her skin, "was talking about skin color, that they were having a problem with each other because of skin color." (*Id.*) Barnett wrote a second memorandum related to the incidents on January 19, in which she stated "I truly believe that Nancy thought [Adams] was out of control." (*Id.* at 37-38.)

Barnett scheduled a second staff meeting for January 24, 2005. (Highwood Dep. at 56.) Highwood, who was still working at the westbound scales, contacted Major Guy Boruff and requested that another ISP employee be present at the meeting. (*Id.* at 65-66.) Lynn Hartman, district coordinator for a neighboring district, attended the January 24 meeting, in addition to the staff of the eastbound scales. (*Id.* at 67-68; Barnett Dep. at 39.) At that meeting, Barnett told Highwood that "what goes on here stays here," and that Highwood would be required to return to work at the eastbound scales. (Highwood Dep. at 67.) Highwood told Barnett that she was afraid to return to the eastbound scales, and that she considered it to be a "hostile work environment." (*Id.* at 67; Barnett Dep. at 40.) Barnett again told Highwood that both she and Adams could be fired if she "took it further." (Highwood Dep. at 68.)

After the meeting, Barnett called Adams and Highwood individually into her office, and gave each an Employee Counseling Form, which both were required to sign. (Barnett Dep. at 43.) Highwood signed her Employee Counseling Form and indicated "in distress" above the signature line. (*Id.* at 49.) In Barnett's office, Highwood requested a transfer to the westbound scales and stated her belief that she was being forced to return to a hostile working environment, as well as her belief that Adams' conduct on January 12 and January 14 was racially motivated. (*Id.* at 49, 56.) Barnett sent Highwood out of her office, and after a short time told Highwood

that she could continue working at the westbound scales on a temporary basis.  (Highwood Dep. at 70.)

In late January 2005 Highwood contacted the ISP Equal Employment Opportunity officer Major Michael Reedus to discuss what had transpired at the eastbound scales and how to initiate a discrimination complaint.  (*Id.* at 102.)  Reedus informed Highwood that she could either file a grievance internally or file a complaint with the Equal Employment Opportunity Commission. (*Id.*)

On February 4, 2005 Barnett participated in a telephone conference with her chain of command, which consisted of Baumgardt, Marty Kipp, Brent Bible, and Major Ed Reuter, to discuss the January 12 incident and subsequent events.  (Barnett Dep. at 23, 53-54.)  Each individual in Barnett's chain of command is Caucasian.  (Highwood Dep. at 97.)  Barnett indicated that Highwood felt threatened by Adams.  (Barnett Dep. at 56.)  Baumgardt had forwarded to the chain of command Barnett's January 14 memorandum in which Barnett stated that Highwood believed there to have been a racial element to the January 12 incident.  (*Id.* at 55.)  It was decided in the telephone conference that all of the employees under Barnett's supervision would have to work together at the eastbound scales.  (*Id.* at .)

The division command determined on February 9, 2005 that Baumgardt would attend a staff meeting at the eastbound scales on February 14, 2005, at which time Barnett would announce that Highwood would return to work at the eastbound scales.  (Bible Dep. at 40; Barnett Dep. at 58.)  At the February 14 meeting, Barnett distributed a memorandum entitled "Scale Meeting."  (*Id.* at 59.)  The memorandum states that "there will be zero tolerance for disrespect of each other here" (*Id.* at 106), and that "[a]ll personnel assigned to the eastbound scales will work eastbound" (*Id.* at 63-64)  Barnett's memorandum concluded with the

following: "In the past, and currently, I know that my decisions and actions or inactions that were disagreeable to certain people have been the topic of many discussions statewide.  As of today I will take any discussion about my supervision of this facility that does not meet others' approval as an **insult** and **follow through with the appropriate procedures already in place**." (*Id.*) (emphasis in original).  Highwood was told during the meeting that she would have to return to the eastbound scales.  (Highwood Dep. at 70-71, 76.)

After the meeting, Highwood asked Barnett and Baumgardt if she could be assigned to work the portable scales.  (*Id.* at 70-71, 76; Baumgardt Dep. at 39; Barnett dep. at 69-70.) Highwood's request was approved contingent upon her completion of the requisite number of inspections. (Highwood Dep. at 76-78; Baumgardt Dep at 23 &31-32; Barnett Dep. at 70-71.) The portables assignment was to rotate among employees, with a cycle of three months working portable scales and three months working at the eastbound scales facility.  (Highwood Dep. at 77.)

February 14, 2005 was Highwood's last working day at ISP; thereafter she was on sick leave under the Family and Medical Leave Act (FMLA), and disability leave due to surgery to repair a hernia and vision problems.  (Highwood Dep. at 25-26, 79-80.)  Barnett returned Highwood's March 7, 2005 request for FMLA leave to Highwood for redrafting because it was not in the proper format for submitting memoranda.  (Barnett Dep. at 78.)  The ISP standard operating procedure for requiring family and medical leave does not indicate to whom the request must be made nor the required format for the request.  (*Id.* at 80; Bible Dep. at 67-68.) On May 2, 2005, Highwood filed a charge with the Equal Opportunity Employment Commission (EEOC) alleging discrimination on the basis of race and religion, and retaliation for complaining about it. (Highwood Dep. at 104-105.)

On July 11, 2005, after being cleared by her physician to return to work, Highwood submitted a physician's letter to ISP, along with a request to work at the westbound scales. (Highwood Dep. at 26-29.)  ISP division command reviewed the request and Highwood's EEOC charge, and determined that Barnett and Baumgardt would decide whether Highwood would return to the eastbound or the westbound scales.  (Bible Dep. at 56-57.)

On July 22, 2005, Barnett left a voicemail message with Highwood informing her that she would be able to return to work at the eastbound scales on July 25, 2005.  (Highwood Dep. at 30.)  On July 25, 2005, Highwood submitted a letter to ISP, in which she stated, "[a]fter receiving the phone message from [Barnett] . . . and being ordered back into a hostile work environment at the I94 east bound scale you have left me with no other alternative than to tender my resignation effective immediately."  (Highwood Dep. at 30.)  According to Highwood, she opted for retirement rather than return to what she considered to be a hostile work environment. (Parkinson Aff. at ¶¶ 5-6.)  On January 18, 2006, the EEOC terminated its investigation and issued a right to sue letter to Highwood.  (Complaint, Ex. B.)

## DISCUSSION

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In seeking a grant of summary judgment the moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (citations omitted.)  Once the movant has met this burden, the non-moving party "must set forth specific facts showing that there is a genuine issue

for trial." Fed. R. Civ. P. 56(e).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

### A.   Hostile Work Environment Claim

In Count I, Highwood claims she endured a hostile work environment. Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . ." 42 U.S.C. § 2000e-2(a)(1) (2006).  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).

In order to prove racial harassment the plaintiff must show that her work environment was both subjectively and objectively offensive.  That is, the environment must be one that a reasonable person would find offensive, and the victim in fact perceived it as such.  *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002).  The plaintiff must then show (1) that the harassment was based on her membership in a protected class – in this case her race; (2) that the conduct was severe or pervasive; and (3) there is a basis for employer liability. *Id. See also  Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004); *Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1043 (7th Cir. 2000).

For the subjective component of her hostile work environment claim, Highwood must establish that she perceived the environment to be hostile or abusive.  *See Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004).  Highwood has met this standard by

testifying that she perceived the environment to be a racially hostile one.  Her testimony is
supported by Barnett's January 19 memorandum, which stated that "I truly believe Nancy
thought [Adams] was out of control."  There is plainly enough evidence for a reasonable jury to
find that Highwood perceived the environment to be a hostile one.  As to whether a reasonable
person would have found the environment to be racially hostile is not quite as clear.  However,
because I find that the harassment was neither severe nor pervasive I need not address that issue.

The next question is whether the harassment was based on race.  Highwood described the
concluding words of her January 12 altercation with Adams as follows: "'They're watching
you.'  And I said, '[t]hey're watching you, too.'  And she picked her skin up and said, 'Who was
black, guys?'"  Adams' statements, although not entirely clear in meaning, make direct
reference to race and therefore contain sufficient "racial...overtones" to allow the trier-of-fact to
construe the harassment to be based on race.  *Hardin v. S.C. Johnson & Son*, *Inc.,* 167 F.3d 340,
346 (7th Cir. 1999); *see also, Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999)(construing
explicit epithets such as "I'm gonna fuck you up, bitch" as possible gender-based statements).

The main point of contention is whether the harassment was so severe or pervasive as to
alter the conditions of Highwood's work environment.  It must be emphasized that the
harassment need not be both severe *and* pervasive.  *Cerros v. Steel Technologies*, 398 F.3d 944,
950 (7th Cir. 2005). In deciding whether a racially hostile environment exists, I must evaluate the
totality of the circumstances, including the frequency of the discriminatory conduct, its severity,
whether it is physically threatening or humiliating or a mere offensive utterance, whether it is
directed to the plaintiff or overheard, and whether it unreasonably interferes with an employee's
work performance.  *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004);
*Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566-567 (7th Cir. 2004).  The Seventh Circuit has found

the overall threshold for severe or pervasive harassment to be very high, stating that "the workplace that is actionable is one that is 'hellish.'" *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (*quoting Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)).

With these standards in mind, I now turn to the evidence in this case, some of which is either not pertinent to the issue at hand or is not admissible. Highwood attempts to show that the hostile work environment was a pervasive one. She points to the fact that Adams told her at some unspecified time in the mid-1990's that "the reason things were the way they were in life was because of the way I was." But there is nothing "inherently racial" about this comment and it does not "implicate a negative attitude" towards a particular race. *See Hardin*, 167 F.3d at 345-46. Highwood further alleges that she was told by former ISP trooper Chuck Bridegroom that he had expressed his concern to the motor carrier inspector division commander that "someone's going to get killed out there if you don't do something about the situation out at those [eastbound] scales." (Highwood Dep. at 74.) However, Highwood's testimony indicates that she does not even remember if she heard this statement from Bridegroom himself or hear an account of the statement second-hand from another individual. (*Id.*) This is hearsay at best and double hearsay at worst and is inadmissible in summary judgment proceedings. *See Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 563 (7th Cir. 1998). Highwood must show that each layer of hearsay falls within an exception, and she has not done so. Fed. R. Evid. 805.

Highwood also attempts to raise an alleged "history of similar confrontational behavior" to support her claim for a pervasive hostile workplace. For example, Highwood alleges that since 1995, all eight of the Caucasian employees supervised by Barnett at the eastbound scales requested transfers because of both verbal abuse from African-American co-workers, and tolerance and furtherance of such conduct by Barnett. As support for this allegation, Highwood

cites the statement in her deposition testimony that "[e]very other white who has gone through [the eastbound scales] at one point or time has come out of there screaming and begging to be removed because of the way they were treated and harassed."  (Highwood Dep. at  61.) However, Highwood provides no specific facts to support her allegation that any of the transfers were motivated by racial harassment.  (Evidently, none of the other employees referenced by Highwood who transferred from the eastbound scales were deposed or testified by affidavit.)

        As a general assertion unsupported by specific instances, the allegation regarding the departures of other Caucasian employees from the eastbound scales is barred from introduction in a summary judgment proceeding by Federal Rule of Civil Procedure 56(e).   Rule 56(e) "demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."  *Davis v. Chicago*, 841 F.2d 186, 189 (7th Cir. 1988) (*quoting Hadley v. County of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1983)).  "Although 'personal knowledge' may include inferences and opinions, those inferences must be substantiated by specific facts."  *Drake v. 3M*, 134 F.3d 878, 887 (7th Cir. 1998).  Because Highwood provides no evidence connecting the alleged departures with discrimination based on race, the Rule 56(e) standard has not been met.  In any event, even if I could consider this evidence, it's worth noting that "the impact of second-hand harassment is not as great as the impact of harassment directed at the plaintiff."  *Ne. Ill. Univ.*, 388 F.3d at 566-67 (*quoting Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir.1997) (internal quotations omitted).   By pointing to alleged harassment suffered by others, Highwood is relying on second hand harassment which weighs less in the "severe or pervasive" analysis.

In an effort to establish the pervasiveness of the hostile work environment, Highwood also alleges that "there was a history of the whites being yelled at and treated poorly and not being allowed to do things where black employees were.  And that came from not only [Robinson and Adams] but it also came from the supervisor [Barnett].  The whites were scrutinized more.  If you were five minutes late, you were scrutinized or reported.  Where [Robinson and Adams] could come in a half hour late and [Barnett] would cover for them." (Highwood Dep. at 62.)   When questioned during her deposition, however, Highwood could offer no specific instances of being scrutinized more and reported when she came in late.  (*Id.*) Even if I were to give Highwood the benefit of the doubt, this is not evidence of "harassment." A plaintiff's complaints about transfers, late overtime payments, salaries, and difficulties with managers have been construed as non-actionable "normal workplace friction," and not severe or pervasive harassment.  *See Herron*, 388 F.3d at 303.  Finally, on the issue of pervasiveness, Highwood attributes to Adams a statement that  "[Caucasians] always were favored... were always given everything and her people were never."

Taken together, these various incidents that Highwood points to simply do not establish a pervasive hostile work environment that altered the conditions of her work. The incidents are either not supported by admissible evidence or are so vague as to be not helpful to Highwood in the analysis. To establish pervasiveness, Highwood needs more. *Compare Hrobowski*, 358 F.3d at 477 (severe or pervasive standard met where plaintiff's co-supervisor suggested plaintiff talk with a subordinate "nigger to nigger," and plaintiff was repeatedly subjected to overhearing that word); *and Daniels v. Essex Group, Inc*., 937 F.2d 1264, 1273-74 (7th Cir. 1991) (actionable claim where racist taunts were directed at plaintiff over a period of several months, "KKK" and "All niggers must die" were written on workplace restroom walls, and black dummy was hung

13

near plaintiff's workspace); *with Ne. Ill. Univ.*, 388 F.3d at 566-67 (claim not actionable where plaintiff primarily heard racist epithets second-hand, and only once directly overheard an epithet, which moreover was not targeted at him personally) *and McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 567 (7th Cir. 2000) (claim not actionable where plaintiff alleged three instances of racist epithets in her presence and none was directed at her).

Highwood also relies on the January 12 and 14 incidents to support her claim that she was subjected to a hostile work environment.  It is true that even one act of harassment will suffice if it is egregious.  *Cerros II*, 398 F.3d at 950.  But as the Seventh Circuit emphasized in the first *Cerros* opinion, pervasiveness and severity "are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while relentless pattern of lesser harassment that extends over a period of time also violates the statute."  *Cerros I*, 288 F.3d at 1047.

While what took place on January 12 and 14 between Adams and Highwood was far from professional, Adams' conduct does not come close to rising to the level of egregiousness that is required to amount to "severe" harassment. And even when it is considered in conjunction with the other evidence that Highwood points me to, I cannot conclude that she was enduring a "hellish" work environment.  Highwood testified that on January 12, Adams approached her in a physically threatening way, issued ambiguous statements suggesting Highwood would be "taken out" and indicated that "they're watching you."  She further testified that on January 14, in a meeting held to discuss the earlier incident, Adams approached Highwood and "started screaming . . . at me, called me Satan, told me I was Satan and that I would get mine."

As noted above, isolated incidents can create changes in the terms and conditions of employments, so long as they are  "extremely serious."  *Faragher v. City of Boca Raton*, 524

U.S. 775, 788 (1998).  However, the events raised by Highwood do not approach the high level of severity necessary to defeat summary judgment.  *Compare Smith*, 189 F.3d at 534 ("damaging [a fellow employee's] wrist to the point that surgery was required, because she was a woman, easily qualifies as a severe enough isolated occurrence to alter the conditions of her employment") and *Daniels*, 937 F.2d at 1274 n. 4 (hypothesizing that a black employee subjected to co-workers arriving at work in Ku Klux Klan attire would represent a single incident giving rise to liability for harassment under Title VII), *with Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999) (granting summary judgment despite allegations that plaintiff was called names in a public place and that supervisor darkly hinted that plaintiff might find a bomb under his car).

While one would hope that employees would not subject their co-workers to the sorts of tirades exhibited by Ms. Adams, the Supreme Court has emphasized that Title VII is not a "general civility code" for the workplace. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998). In sum, the harassment in this case was neither severe nor pervasive. Summary judgment is therefore granted to ISP on this claim.[2]

### B.  Disparate Treatment on the Basis of Race

Count I of Highwood's complaint also includes a claim of disparate treatment on the basis of race, alleging that she was treated less favorably as a result of the January 12 altercation.   A plaintiff in an employment discrimination case can avoid summary judgment by presenting either direct or indirect evidence showing discriminatory intent by the defendant or its agents. *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005).  Highwood proceeds

---

[2]  Because I have concluded that Highwood was not subjected to a hostile work environment, I need not address ISP's argument that there is no basis for employer liability in this case.

under the indirect method.  Under the indirect, burden-shifting method first articulated in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff must establish that 1) she is

a member of a protected class; 2) she was meeting her employer's legitimate performance

expectations; 3) she suffered an adverse employment action; and 4) other similarly situated

employees who were not members of the protected class were treated more favorably.  *See Fane*

*v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).  Where reverse discrimination is

alleged, a plaintiff must also show as a fifth element that "background circumstances" exist to

show an inference that the employer has "reason or inclination to discriminate invidiously

against whites" or evidence that "there is something 'fishy' about the facts at hand." *Ballance*,

424 F.3d at 617; *see also Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455-57 (7th Cir. 1999).

Highwood's claim for disparate treatment on the basis of race fails because she has not

shown that she was subject to a materially adverse employment action, which the Seventh

Circuit has defined as something "more disruptive than a mere inconvenience or an alteration of

job responsibilities." *Rhodes v. Ill. Dep't of Transp*, 359 F.3d 498, 504 (7th Cir. 2004).

Categories of recognized materially adverse employment actions include reductions in financial

terms or fringe benefits of employment, transfers or refusals to transfer which significantly

reduce career prospects, or changes in working conditions such that an objective hardship is

created.  *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002).  "Typically,

adverse employment actions are economic injuries."  *Whittaker* 424 F.3d at 647 (*quoting Markel*

*v. Board of Regents of Univ. Of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002)).

None of the acts taken by ISP amount to a materially adverse action for purposes of a

disparate treatment claim on the basis of race, including Barnett's threats of termination.  *See*

*Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 531 (7th Cir. 2003) (unfulfilled threat

which results in no material harms is not materially adverse).  ISP's refusal to transfer Highwood

to the westbound or portable scales does not constitute a materially adverse employment action

because the different assignments were equivalent in all material respects.  *See Herrnreiter,* 315

F.3d at 745(finding transfer between otherwise equivalent stationary and roving assignments a

non-actionable matter of personal preference); *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d

270, 274 (7th Cir. 1996)("Obviously, a purely lateral transfer, that is, a transfer that does not

involve a demotion in form or substance, cannot rise to the level of a materially adverse

employment action."); *see also*, *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 275 (7th

Cir. 2004)(holding that employer's refusal to laterally transfer plaintiff to position with same

pay, benefits, and responsibilities did not constitute adverse employment action).

Highwood also claims constructive discharge as an adverse employment action, but

because she cannot establish a hostile working environment, she consequently cannot establish

constructive discharge.  *Tutman v. WBBM-TV, Inc./CBS, Inc.,* 209 F.3d 1044, 1050 (7th Cir.

2000)("Working conditions for constructive discharge must be even more egregious than the

high standard for hostile work environment...").

### C.  Retaliation

In Count II of her complaint, Highwood alleges that ISP retaliated against her for

complaining about a hostile work environment.  The effective enforcement of Title VII would be

thwarted if employees did not feel free to approach officials with their grievances.  *See*

*Burlington Northern and Santa Fe Ry. Co. v. White*, __U.S. __, 126 S. Ct. 2405, 2414

(2006)(citing *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)).  Title VII's

anti-discrimination provision makes it unlawful "for an employer to discriminate against any of

his employees . . . because he has opposed any practice made an unlawful employment practice

by [Title VII]." 42 U.S.C. § 2000e-3(a) (2006). A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method. *Phelan v. Cook County*, 463 F.3d 773, 787-88 (7th Cir. 2006). Highwood proceeds before this Court under both the direct and indirect methods, but because Highwood succeeds under the direct method, the Court does not address her arguments under the indirect method.

To establish a prima facie case under the direct method, a plaintiff must to show: (1) that she engaged in statutorily protected activity; (2) that she suffered a materially adverse action taken by the employer; and (3) a causal connection between the two. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007); *Burlington*, 126 S.Ct. at 2415. "If [the evidence] is contradicted, the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive." *Phelan,* 463 F.3d at 787 (*quoting Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)).

Filing a complaint with the EEOC qualifies as a protected activity. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Filing an official complaint with an employer may also constitute statutorily protected activity under Title VII, but the complaint must indicate that the discrimination occurred because of the complainant's membership in a protected class. *Id.* A complaint of a violation of Title VII that does not ultimately have merit will nonetheless receive protection unless it is completely groundless. *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 890 (7th Cir. 2004) (*citing McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir. 1996)). A plaintiff at minimum must show that she had a "reasonable belief" she was challenging conduct prohibited by Title VII. *Mattson*, 359 F.3d at 890 (*citing Dey v. Colt Constr. & Dev. Co*., 28 F.3d 1446, 1458 (7th Cir.1994)).

Highwood's complaint to Barnett on the afternoon of January 12 regarding the altercation with Adams can be considered a protected activity.  Barnett's memorandum describing the complaint shows she was informed about the incident, that Highwood felt it was grounded in racial issues, and that Highwood feared for her safety due to Adams' behavior.   Highwood's January 12 complaint to Barnett, therefore, indicated a reasonable belief on the part of Highwood that her Title VII rights had been violated.  In addition, at the January 24 meeting held to discuss the January 12 incident, Highwood announced to Barnett that she felt the eastbound side was a "hostile work environment."  Although informal oral complaints do not constitute protected expression where an employer maintains a formal process for employees to communicate claims of communication, *see Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2005), Defendant indicated in response to Plaintiff's Interrogatory No. 18 that it does not allege that Highwood failed to follow ISP policies for reporting harassment and employment discrimination with respect to the January 12 incident.  Though this admission does not necessarily mean that in reporting the incident to Barnett on January 12 that Highwood was following official procedure (the admission could for example refer to Highwood's contacting ISP's EEO officer), Baumgardt's testimony indicates that the oral report to Barnett, and eventual submission of Barnett's written report to Baumgardt, was proper procedure.  (*See* Baumgardt Dep. 15:23-16:17.)

The main retaliatory acts at issue consist of Barnett's threats of termination to Highwood. On January 14th, Barnett is alleged to have said, "What goes on here stays here.  You do not take this down to Indianapolis.  You do not take it anywhere."  Highwood claims that at the same January 14 meeting, Barnett told her that if she went forward with her complaints about the incident with Adams, both Highwood and Adams would be fired.  On January 24, Barnett is

19

once again alleged to have stated, "what goes on here stays here," and that Highwood would be fired if she "took it further."

To prove a materially adverse action in a Title VII retaliation claim, a plaintiff need not meet the same standard of harm of Title VII's substantive anti-discrimination provision, which requires an act constituting a change in the terms and conditions of employment. *See Roney*, 474 F.3d at 461 (*citing Burlington*, 126 S. Ct. at 2414). Rather, the standard for actionable retaliation under Title VII is broader than that for discrimination and may stem from an act "that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Id.* (*citing Burlington*, 126 S. Ct. at 2415); *see also*, *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 660 (7th Cir. 2005) ("Section 2000e-3(a) [retaliation] is 'broader' than Section 2000e-2(a) [discrimination] in the sense that retaliation may take so many forms, while Section 2000e-2(a) is limited to discrimination 'with respect to [the worker's] compensation, terms, conditions, or privileges of employment.'") This is a context-driven inquiry. *See Burlington*, 126 S. Ct. at 2415.

The Court agrees with Highwood's contention that Barnett's warnings and threats of termination if Highwood continued to bring her complaints to Barnett's supervisors constituted a materially adverse employment action. Unlike in discrimination actions, threats and warnings of disciplinary actions, standing alone, may constitute materially adverse actions for purposes of Title VII retaliation claims. *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 849 (7th Cir. 2007). Barnett's alleged threats could certainly have dissuaded a reasonable employee from pursuing a charge of discrimination.

Highwood alleges that she was told she would be terminated if she took her previous complaints of race-based harassment any "further" to "Indianapolis," implying retaliation if

Highwood brought her complaints to headquarters and to Barnett's supervisors.  (Highwood Dep. 65-68).  A reasonable jury could therefore conclude that Highwood's protected activity (her complaints) caused the adverse action (the threats of termination).  There is at least a genuine issue of fact in that regard.

In assessing ISP's liability for Barnett's retaliatory discrimination, we apply the doctrine of *respondeat superior*, by which an employer is liable for acts of employees that are within the scope of their employment.  *See Byrd v. Ill. Dep't of Pub. Health*, 423 F.3d 696, 707 (7th Cir. 2005); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).   A fact-finder could conclude that Barnett's statements to Highwood threatening termination were made within the scope of Barnett's employment.

Highwood has made out a prima facie case of retaliation under the direct method, and ISP has offered no affirmative defense that it would have taken the challenged action even if it had no retaliatory motive.  *See Pantoja*, 495 F.3d at 848.  Highwood also argues that other incidents amounted to retaliation on the part of ISP, including its denials of her transfer requests, its issuance of the Employee Counseling Form, and its requirement that Highwood redraft her FMLA leave request to correct for formatting.  Because we find Highwood's allegations concerning Barnett's threats to be dispositive, we do not address Highwood's additional allegations of materially adverse actions by ISP.

## CONCLUSION

Defendant's Motion for Summary Judgment [DE 14] is **GRANTED IN PART** and **DENIED IN PART**.  Defendant's Motion for Summary Judgment is **GRANTED** with respect to Counts I and III of Plaintiff's Complaint, and **DENIED** with respect to Count II.

**SO ORDERED**.

ENTERED: November 5, 2007

/s Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT